## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

CLAUDIA BEA SCOTT,          )
                                  )
          Plaintiff,         )
                                  )
vs.                         )     Case No. 1:08CV0145 AGF
                                  )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,  )
                                )
          Defendant.      )

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Claudia Bea Scott was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or Supplemental Security Income ("SSI") under Title XVI of the Act, id. §§ 1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall be reversed and the case remanded for further consideration.

Plaintiff, who was born on March 15, 1946, filed for Disability Insurance Benefits and SSI on December 14, 2006, at the age of 60, alleging a disability onset date of July 6, 2006, due to back problems, arthritic shoulders and knees, high blood pressure, hearing loss, memory loss, and emotional problems.  After Plaintiff's application was denied at the initial administrative level, she requested a hearing before an Administrative Law

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

Judge ("ALJ") and such a hearing was held on July 26, 2007.  By decision dated

February 29, 2008, the ALJ found that Plaintiff had the residual functional capacity

("RFC") to perform a wide range of light work, including her past job as a nurse's aide,

as she had performed it, and therefore was not disabled under the Act.  Plaintiff's request

for review by the Appeals Council of the Social Security Administration was denied on

July 18, 2008.  Plaintiff has thus exhausted all administrative remedies and the ALJ's

decision stands as the final agency action now under review.

Plaintiff argues that the ALJ committed reversible error by failing properly to

weigh the opinion of one of Plaintiff's physicians (Thomas Satterly, D.O.); failing to re-

contact that physician; assessing an RFC that was not supported by the evidence; failing to

give proper weight to Plaintiff's subjective complaints of pain; and failing to consider the

combined impact of Plaintiff's impairments.

## BACKGROUND

### Work History and Application Form

Plaintiff wrote on her Work History Report submitted with her application for

disability benefits that she worked as a Certified Nurse Assistant ("CNA") for several

residential care facilities from February 1993 to December 2002, earning between $5.00

and $7.00 per hour.  She described her duties from February 1993 to September 1994 as

consisting of sweeping, mopping, vacuuming, doing laundry, doing dishes, and emptying

trash.  She stated that at this job, she walked for four hours per day, stood for four hours,

climbed for one hour, knelt for one hour, crouched for two hours, did not stoop or crawl,

and never lifted more than 10 pounds.

She wrote that at her job as a CNA from November 1994 to September 1995, she walked for seven hours per day, stood for seven hours, sat for one hour, stooped for one hour, knelt for one hour, crouched for one hour, did not crawl, and lifted up to 20 pounds. From October 1995 to October 1996, Plaintiff's job as a CNA consisted of caring for, feeding, and changing residents. At this job, she walked for seven hours per day, stood for seven hours, sat for 30 minutes, knelt for three hours, crouched for three hours, lifted up to 100 pounds (patients) occasionally, and 50 pounds frequently, and did not climb, stoop or crawl. Her work from November 1996 to December 2002 required walking for seven hours per day, standing for seven hours, sitting and climbing for one hour, kneeling for one hour, crouching for one hour, no stooping or crawling, lifting ten pounds frequently and 20 pounds occasionally. No description of exertional requirements was provided on Plaintiff's Work History Report for jobs that she held after December 2002. She reported that she worked briefly as a cashier from February to June 2003, and went back to work as a CNA from July 2003 to June 2006. The record indicates that Plaintiff was employed as a part-time in-home care worker from July 2006 until December 2006, working approximately seven hours per week at $6.00 per hour. Plaintiff wrote that she stopped working because, "Clients have complained so much that the company cut my hours because they know I am not able to do the job." (Tr. 75-98, 103.)

Earnings records show no significant earnings before 1970, and no earnings from 1970 to 1989. From 1989 to 2006, Plaintiff's earnings fluctuated between a low of

approximately $3,000, and a high of approximately $20,000 in 2001.  (Tr. 72.)

On her application, Plaintiff described her daily activities as watching TV, crocheting, and occasionally going to town with her daughter, whose residence she shared. Plaintiff stated that she had to be reminded to take her medications, and that her condition occasionally affected her ability to dress herself.  She also stated that she was able to perform light household chores such as washing dishes and folding laundry, but that she experienced difficulty walking up or down stairs.  She reported that she did not drive due to back pain and numbness in her right leg, and that she left the house infrequently. Plaintiff reported that she attended church twice a month and went grocery shopping once a week with her daughter.  She indicated that she could walk only ten feet before needing to rest, and that she had trouble following written and spoken instructions.  (Tr. 82-89.)

**<u>Medical Record</u>**

The earliest medical evidence in the record is a 1999 report by M.L. Gates, M.D., which indicated that an image taken of Plaintiff's chest showed mild degenerative changes in the spine compared with her condition in 1995.  (Tr. 229-33.)  In February 2003, Plaintiff received a routine physical examination accompanied by blood work and an electrocardiogram ("EKG"), which showed an elevated level of triglycerides and a possible left anterior fascicular blockage.  (Tr. 306-14.)  During a subsequent visit to re-check her cholesterol in May 2003, Plaintiff was examined by Nina Hill, M.S.N., R.N., whose notes described Plaintiff as suffering from hypertension, hypercholesterolemia, and obesity, with a history of depression and smoking.  Nurse Hill noted that Plaintiff

4

appeared "well developed, well nourished, obese, in no apparent acute distress," and that she moved all extremities without difficulty. (Tr. 296.)

In December 2005, Plaintiff was hospitalized after complaining of chest pain and difficulty breathing. She was diagnosed with moderate carotid occlusive disease with continued elevation of both her cholesterol and triglycerides. Plaintiff was prescribed Lexapro for her depression and Zocor for her heart condition. In March 2006, Plaintiff's triglycerides remained elevated, and her dose of Zocor was increased. (Tr. 175-214.)

In October 2006, Plaintiff was examined by Muhammad Salmanullah, M.D., who reported that she continued to suffer from hyperlipidemia, hypertension, and depression. Dr. Salmanullah prescribed Vytorin for cholesterol, Mycardis for hypertension, and Lexapro and Zoloft for depression. (Tr. 139-44.) Plaintiff saw Dr. Sulmanullah for follow-up for her high blood pressure on January 5, 2007, and was prescribed TriCor and Coreg. (Tr. 291).

On January 24, 2007, Chul Kim, M.D., examined Plaintiff in connection with her application for disability benefits. Dr. Kim noted that Plaintiff had developed pain in her lower back and legs after a car accident in 1997. He reported that Plaintiff was not taking any arthritis medication because she was afraid of side effects, and that she was not taking prescribed pain medication because she could not afford it. Dr. Kim described Plaintiff as obese, with a clear mental state and good memory. On examination, he noted tenderness and pain in Plaintiff's lower back, and limited flexion to 70 degrees of the lumbar spine

and to 115 degrees in the right knee.[2]  Dr. Kim found no significant range of motion

limitation in Plaintiff's hips and ankles, and noted that Plaintiff's gait was stable, that she

was able to get on and off the examining table, and that she could walk on heels and toes

without significant problems, but that she had trouble squatting due to back pain.  A

lumbar spine x-ray revealed a "mild degree" of degenerative joint disease.  (Tr. 154-57.)

On February 7, 2007, non-examining state psychological consultant Peter Moran,

D.O., completed a psychiatric review, that indicated that Plaintiff suffered from

depression.  Her limitations from mental impairment were determined to be "non-severe,"

and her allegations were found to be only partially credible as they were deemed not fully

consistent with the medical evidence on file.  (Tr. 158-68.)

The record includes a physical RFC assessment form completed on February 8,

2007, by "J. Dunlap," whose name is typed on the line marked "Medical Consultant's

Signature," but does not include any indication, such as "D.O" or "M.D.," that Mr. Dunlap

was a medical source.  The form indicated that Plaintiff had mild degenerative joint

disease, which did not impose significant limitations on her range of motion or her ability

to walk.  Mr. Dunlap found that Plaintiff could occasionally lift and/or carry 20 pounds;

frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight

hour workday; sit with normal breaks for a total of six hours in an eight-hour work day;

and push and/or pull without limitation other than those shown for lifting and carrying.

---

[2]     Normal flexion ranges for the lumbar spine and the knee are 0-90 degrees and
0-150 degrees, respectively.

The portion of the form asking for a description of evidence that supported the consultant's conclusions contained a summary that mirrored the findings of Dr. Kim following his examination on January 24, 2007. (Tr. 169-74.)

On March 5, 2007, Plaintiff saw Dr. Salmanullah and complained of back pain and difficulty sleeping. He prescribed Ultram ER for her pain, and Trazodone for depression and insomnia. On March 23, 2007, Plaintiff was admitted to the hospital after complaining of chest pains, fatigue, headaches, and back pain. Diagnostic tests revealed normal results, except for elevated cholesterol and triglycerides. Upon discharge the next day, Plaintiff was told to continue to take Tramadol (for pain), along with Ultram, and to follow up with her primary care physician regarding her back pain. (Tr. 215-16.)

**Evidentiary Hearing of July 26, 2007 (Tr. 19-32)**

Plaintiff testified that she had received an eighth grade education and did not attend high school because her parents could not afford it. She first began working at the age of 16. She stated that she had difficulty with spelling and with reading "some of the words." Plaintiff testified that she had last been employed from July to December 2006 performing in-home cleaning and cooking tasks for individuals with health problems, usually less than 20 hours per week. She last worked as a CNA in June 2006. Plaintiff explained that she stopped working for one nursing home because it closed (two or three years before the hearing), and that she left her job at another nursing home in mid-May 2006 because she moved to another state (Illinois) to live with her daughter. She stated that she stopped working as an in-home care worker because her back condition left her unable to walk

after returning home from work.

Plaintiff testified that the pain in her back was severe enough to prevent her from doing tasks such as sweeping and washing dishes, and that she spent most of her time in a chair or lying down. She testified that she was not seeing any health professionals for her back problems because she had no money, but she also testified that she was going to begin seeing different doctors because she was dissatisfied with her current doctors, whose names she could not remember. Plaintiff stated that she had been living with her daughter for about one year.

Plaintiff described her daily activities as being mostly confined to crocheting. She stated that she was unable to walk more than half a block, that she was only able to help with household chores on occasion, and that she was mostly confined to her bed or her recliner. She was currently taking medicine for her high blood pressure and cholesterol, Zoloft for her depression, and Ultram for her back pain.

Plaintiff testified that she had been on Medicaid for several months and had been receiving treatment and medication samples from doctors through a subsidized community care facility. She stated that she could not drive because her back would begin to hurt, and her right leg would go numb if she attempted to drive "a distance."

Plaintiff testified that she had been hospitalized because of "nervous breakdowns" for nine to ten days in both 1986 and 1987, and that since that time, had been taking medication for depression. She stated that she experienced difficulty with her hearing and her memory. She testified that her work as a cashier had only lasted for three months

because she could not "understand the register." She required help from her daughter to bathe and her back hurt when she bent over.

**Post-Hearing Evidence**

On August 6, 2007, Plaintiff saw Prem Varma, M.D., with complaints of fatigue, shortness of breath, and chest pains. Diagnostic tests conducted that day and on August 13, 2007, showed mild cardiomegaly and possible diastolic dysfunction, with no acute cardiopulmonary findings. (Tr. 252-72.) Plaintiff saw Dr. Varma again on August 20, 2007, and complained of anxiety and back pain. Her current medications included, among others, Celexa, Trazodone, and Zoloft for her mental problems; and Tramadol and Motrin for her back pain. Dr. Varma reported that Plaintiff was in no acute distress; was alert and cooperative, with normal mood, affect, attention span, and concentration; and was oriented, with reasonable judgment and insight. (Tr. 248-50.) A lumbar spinal image taken on August 20, 2007, revealed straightening of the lumbar lordosis and minimal narrowing of the L5-S1 disc space. (Tr. 251.)

Examinations by Dr. Varma in September and October 2007 did not reveal any musculoskeletal or neurological deficits or abnormalities other than one back spasm during her visit on September 21, 2007. (Tr. 236-50.) In October 2007, Plaintiff underwent an MRI and a whole body bone scan that revealed mild thoracic degeneration, osteophytic changes of the shoulders and knees, mild stenosis at L3-4, and facet arthropathy at L5-S1. (Tr. 234-35, 273.)

On December 18, 2007, Plaintiff saw Dr. Satterly, an orthopedic and spine surgeon,

upon referral by Dr. Varma. Dr. Satterly examined Plaintiff and filled out a Medical Source Statement of Ability to Do Work Related Activities, in which he indicated in check-box format that due to "severe" degenerative disc disease of the knees, shoulders, and back, Plaintiff was unable to frequently lift any weight; remain standing or walking for even two hours without alternating positions or lying down; or climb, balance, kneel, crouch, crawl, or stoop. He also indicated that her ability to push, pull, and reach was limited. Dr. Satterly reported that the bases for his opinions were his physical examination and the October 2007 bone scan and MRI. He ordered a CT scan, but the results of this scan are not contained in the record. (Tr. 275-78.)

A letter dated January 3, 2008, from Plaintiff's counsel to the ALJ, stated that Plaintiff saw Robert Ritchey, R.N., at Dr. Satterly's clinic on November 21, 2007, and that Nurse Ritchey increased Plaintiff's pain medication from "5-500" hydrocodone to "10-500" hydrocodone. The letter also stated that Plaintiff was scheduled for a follow-up appointment with Dr. Satterly on January 7, 2008, to discuss surgical treatment options. (Tr. 274.)

**ALJ's Decision of February 29, 2008 (Tr. 11-16)**

The ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since July 6, 2006. He assumed that her work since that time as a part-time in-home care worker did not amount to SGA. He then found that Plaintiff satisfied the requirement for a severe impairment, because her ability to do basic work activities was more than minimally limited by degenerative disc and joint disease. The ALJ "dismissed"

Plaintiff's allegations regarding hearing and memory loss, for lack of objective medical evidence corroborating these allegations. In addition, the ALJ found that neither Plaintiff's high blood pressure nor her mental impairment were severe enough to cause significant work-related limitations and were, thus, not severe impairments.

The ALJ determined that Plaintiff's degenerative disc and joint disease, although severe, did not meet or medically equal a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ proceeded to determine Plaintiff's RFC, noting the factors relevant to assessing Plaintiff's credibility, as set forth in Polanski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

The ALJ summarized the medical evidence and concluded that it did not support a finding of disability. The ALJ gave Dr. Satterly's opinion only "slight" weight, on the ground that Dr. Satterly did not provide any objective data to support his opinion, which was rendered before Dr. Satterly saw the results of the CT scan he ordered, and on the additional ground that Dr. Satterly's opinion was "grossly inconsistent with the record as a whole."

The ALJ also found that Plaintiff was not entirely credible. In support of this conclusion, the ALJ pointed to Plaintiff's part-time employment as a home health aide for six months after her alleged onset date as some evidence of an ability to work. He stated that the record indicated that Plaintiff had suffered from degenerative disc disease since at least 1999, but that, as there was no evidence of significant deterioration since that time, the condition could not be considered disabling when Plaintiff had engaged in SGA in

spite of it.

The ALJ also stated that Plaintiff had "seldom" visited a physician for lumbar treatment, and pointed out that when she began treatment with Dr. Varma in August 2007, he did not diagnose a lumbar disorder. Furthermore, the record indicated, according to the ALJ, that Plaintiff's primary treatment had been conservative, consisting of analgesics. The ALJ noted that Ultram, which Plaintiff testified was her primary analgesic, was widely prescribed for relief of mild to moderate pain, and that Plaintiff did not require treatment other than medication, such as an assistive device. He pointed to Plaintiff's testimony that she left her job as a CNA in mid-2006 because she moved and not because of an impairment, and he stated that at the hearing, Plaintiff was "vague" about the details of her impairment.

The ALJ found that Plaintiff had the RFC to lift, carry, push, or pull 20 pounds occasionally and ten pounds frequently; sit for at least six hours in an eight-hour day; stand and/or walk for a total of at least six hours in an eight-hour day; and occasionally crouch. She did not have any other postural limitation, nor did she have any manipulative or environmental limitations. Thus, according to the ALJ, she was capable of performing a wide range of light work.[3]

Based on the job descriptions contained in Plaintiff's Work History Report, the

_____

[3]    "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls.

ALJ concluded that her past employment as a CNA did not require more than light exertional capacity, and therefore, that she had been capable of performing this job since July 6, 2006, and was not disabled under the Social Security Act.

**Request for Review by Appeals Council**

The record contains a letter dated March 10, 2008 from Plaintiff's counsel to the Appeals Council requesting review of the ALJ's decision. In the letter, Plaintiff's counsel requests a 60-day extension to submit additional relevant medical evidence and to file a supplemental brief. (Tr. 6). The request for additional time was granted by the Appeals Council. (Tr. 4-5). No additional medical evidence or supplemental brief is contained in the record, and, as noted above, the Appeals Council denied review on July 18, 2008.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not

warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).  A court should "disturb the ALJ's decision only if it falls outside the available "zone of choice."  Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three

whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix 1. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work as she actually performed it, or as generally required by employers in the national economy. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.

## Weight Accorded by the ALJ to Dr. Satterly's Opinion

Plaintiff argues that the ALJ committed reversible error in failing to consider Dr. Satterly to be one of Plaintiff's treating physicians, and in failing to give adequate weight to Dr. Satterly's opinion of December 18, 2007. Plaintiff argues that Dr. Satterly was a treating physician by virtue of the fact that Plaintiff was referred to him for treatment by her primary care physician, Dr. Varma. Plaintiff argues that the fact that Dr. Satterly only examined her once does not mean that he was not a treating physician, as only the one visit was necessary because Dr. Satterly ruled out surgical treatment.

Plaintiff further argues that the ALJ incorrectly stated that Dr. Satterly's opinion was not supported by objective evidence, as the opinion was supported by the October bone scan and lumbar spinal MRI. Plaintiff maintians that the ALJ incorrectly found that Dr. Satterly's opinion was inconsistent with the record as a whole. According to Plaintiff, the opinion in question was consistent with the October 2007 bone scan and MRI.

Plaintiff also argues that the ALJ erred in failing to consider that Dr. Satterly was a specialist.

The weight to be given a medical opinion is governed by a number of factors, including the examining or treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). However, an ALJ may "'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Wildman v. Astrue, ___ F.3d ___, 2010 WL 760240, at *2 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F. 3d 785, 790 (8th Cir. 2005)).

In the present case, the Court concludes that the ALJ was entitled to accord Dr. Satterly's opinion only slight weight. Dr. Satterly only examined Plaintiff once and thus cannot fairly be characterized as a treating physician. A physician will be regarded as a "treating physician" only if the physician has seen the patient "a number of times and long enough to obtain a longitudinal picture of [the patient's] impairment." 20 C.F.R. § 404.1527(d)(2)(i).

Generally, a one-time evaluation by a non-treating [medical source] is not entitled to substantial weight. Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998). Furthermore, in Wildman, the Eighth Circuit recently reiterated that a "'checklist format,'" as used by Dr. Satterly, limits the "'evidentiary value'" of a medical source's assessment. 2010 WL 760240, at *3 (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).

**The ALJ's RFC Assessment**

Plaintiff argues that the ALJ's finding that Plaintiff had the RFC to perform a wide range of light work is not supported by substantial evidence and is contrary to the best evidence which documents Plaintiff's inability to stand and work for six hours out of an eight-hour work day. In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must

support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 7, 711-12 (8th Cir. 2001.)  The ALJ is therefore required to consider at least some supporting evidence from a medical professional.  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).

Here, the ALJ's RFC assessment tracks Mr. Dunlap's February 2007 RFC assessment, which is problematic because as noted above, Mr. Dunlap does not appear to be a medical source.  Having discredited Dr. Satterly's opinion, the record was left devoid of a medical opinion on Plaintiff's ability to perform work-related activities upon which the ALJ could rely.  The Court recognizes that an explicit reference to "work" in close proximity to the description of the claimant's medically evaluated limitations does not make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation; such explicit language is unnecessary where the medical evaluation describes the claimant's functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment."  Cox, 495 F.3d at 620 n.6.

In Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008), for example, the Eighth Circuit held that substantial evidence supported the ALJ's conclusion that the claimant had the RFC to perform light work, and, thus, her past work, where medical records indicated that she suffered only mild degenerative changes in her back condition, even though the medical evidence was silent with regard to work-related restrictions such as the length of time she could sit, stand, and walk.  The Court reasoned that as it was the claimant's

burden to prove at step four that she could not perform her past relevant work, her "failure to provide medical evidence with this information should not be held against the ALJ when there is medical evidence that supports the ALJ's decision." Id.

Here, however, although the ALJ gave Dr. Satterly's opinion little weight, the record cannot be said to be silent with regard to Plaintiff's RFC. The Court believes that the better course in the present case is to reverse the ALJ's decision and remand the case for a medical assessment of Plaintiff's physical RFC, and for reconsideration of Plaintiff's application for benefits based upon the record as a whole, including the new evidence. See Grogan v. Astrue, No. 1:07CV132 LMB, 2009 WL 877707, at *3 (E.D. March 26, 2009) (reversing ALJ's decision and remanding case where the record did not contain an opinion by any physician, treating or consulting, other than one discredited by the ALJ, regarding the plaintiff's ability to function in the workplace).

The ALJ may wish to re-contact Dr. Satterly, and may also find it necessary to obtain the testimony of a VE to determine whether there are jobs that a person with Plaintiff's vocational profile and RFC could perform. The Court notes that even accepting the ALJ's present RFC assessment, it is questionable whether this RFC comports with the ability to perform the job of CNA as Plaintiff performed it or as it is generally performed. The majority of Plaintiff's CNA jobs, as she described them, required walking for seven hours in an eight-hour work day, and the Dictionary of Occupational Titles considers the job of a Nurse Assistant (Code: 355.674-0140) to be medium work, not light work.

**Combination of Impairments**

As Plaintiff argues, an ALJ must consider a claimant's impairments in combination. See 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5 (when assessing an individual's RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'"; when considered in combination, "the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do"); Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000) (holding that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling").

Case law does not require "an elaborate articulation of the ALJ's thought processes" where the ALJ discusses and considers each of a claimant's multiple impairments, and concludes that they are not disabling in combination. See, e.g., Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Here, however, unlike in Browning and similar cases, the ALJ nowhere states, even summarily, that he considered Plaintiff's impairments in combination at any step of the sequential evaluation process. The ALJ is directed to explicitly consider, upon remand, Plaintiff's impairments in combination. See Clark v. Astrue, No. 4:06CV0984 ERW, at 5 (E.D. Mo. Sept. 11, 2007) (remanding case where the ALJ did not state that he considered the claimant's impairments in combination).

## CONCLUSION

The ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further development of the record and reconsideration of Plaintiff's application.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of March, 2010.